NYDIA SÁNCHEZ GÓNZALEZ ET AL., Plaintiffs and Appellees, *v.* LIBERTY MUTUAL INSURANCE COMPANY, Defendant and Appellant; LIBERTY MUTUAL INSURANCE COMPANY, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, ALFONSO L. GARCÍA MARTÍNEZ, JUDGE, Respondent.

Nos. R-71-31, O-71-30. Decided May 28, 1971.

*Agrait, Oliveras & Otero* for appellant and petitioner. *R. Elfren Bernier* and *Plinio Pérez Marrero* for appellees.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

We must determine whether the amounts granted for lost profit and mental anguish suffered as a result of the death of the young woman Clara Sánchez González, caused when the motor vehicle in which she was traveling was hit in the rear by another automobile, and as a result of the injuries suffered by the boy Néstor Kercadó Sánchez in said accident, are fair and reasonable or whether they are excessive. They are excessive, and therefore should be reduced in the particulars which we state hereinafter.

The compensations, which the trial court ordered appellant to pay, were the following:

1—To Carlos Sánchez Reverón and Rosalina González Sánchez

 a. on equal parts, as heirs and dependents, for the economical value of the life of their deceased daughter Clara Sánchez González ... $128,745.64

 b. on equal parts, as heirs, for the physical suffering and mental anguish of the deceased .............................. $100,000.00

 c. on equal parts for funeral expenses . $ 1,809.00

2—To Rosalina González Sánchez for the mental anguish sustained as a result of her daughter's death ........................ $ 50,000.00

3—To Carlos Sánchez Reverón, for the

mental anguish sustained as a result of his
daughter's death ........................ $ 25,000.00

 4—To Nydia Sánchez González for the mental anguish sustained as a result of her sister's death ............................... $ 30,000.00

 5—To Zoraida Sánchez González for the mental anguish sustained as a result of her sister's death ........................... $ 5,000.00

 6—To Néstor Kercadó Sánchez for the physical injuries, pain suffered, and resulting nervous condition ........................ $ 2,500.00

 7—To Néstor Kercadó Landrau for the mental anguish, as a result of the physical injuries suffered by his son, and resulting nervous condition ........................ $ 2,500.00

 8—To Zoraida Sánchez González for the mental anguish, as a result of the physical injuries suffered by her son, and resulting nervous condition ........................ $ 2,500.00

 Said amounts are challenged on the following grounds:

1–2. The amount for the economical loss of the deceased's parents was computed on the basis of the deceased's life expectancy and not on the basis of the life expectancy of her parents, appellees herein. Besides, the trial court erred in giving absolute credit to the testimony of the expert economist.

Said expert determined that the decedent's life expectancy was 39 years. He did not take into consideration her parents' life expectancy. At her death Clara Sánchez González earned a monthly salary of $210. From 1971 on it was considered as increased to $310 a month. An increase of 3.7% in the cost of living was considered. Then the actual value was determined based on a 5% rate of interest. The actual value of the income for the Christmas bonus which was computed

in the sum of $3,136.57 as well as the actual value of the additional income of $35 a month[1] which amounted to $13,134.63 was added to the result of $99,379.81. The total of all this amounted to the sum of $128,745.54 granted for the aforementioned economic loss.

■ In order to determine the reasonability of the foregoing amount, let us determine said economic loss using the formula we adopted in *Widow of Seraballs* v. *Abella Hernández*, 90 P.R.R. 360, 362 (1964), modified in *Rodríguez* v. *Ponce Cement Corp.*, 98 P.R.R. 196, 213, 214 (1969).

With the increases on the basis of steps authorized by law, the income of the deceased would have been the following:

| | |
|---|---|
| 1968 | $ 2,760 (per year) |
| 1969 | 3,060 |
| 1970 | 3,420 |
| from 1971 to 2007 | $133,920 |
| Total | $143,160 |

To this we must add the additional biweekly income of $35, that is, $840 yearly during 39 years

| | |
|---|---|
| | 32,760 |
| Total | $175,920 |

Add to that the Christmas bonus computed on a 4% basis

| | |
|---|---|
| | 7,036.80 |
| Total | $182,956.80 |

The annual average income based on this last Total income in 39 years is

| | |
|---|---|
| | $ 4,691.20 |

---

[1] The trial judge concluded that this additional income was of $35 *biweekly*. It appears thus from the testimony of Rosalina González Sánchez, the deceased's mother.

One-third should be deducted from this average income for the deceased's own expenses, that is, the amount of $1,563.73. The remaining $3,127.47 is the annual average amount allocated for the support of the parents, appellees herein, that is, their economic loss. The actual value of that amount payable every year during 39 years is obtained by multiplying said sum by the lowest value shown on the actuarial table based on 6%, that is, 14.949. Said value amounts to $46,752.55. *Seraballs, supra* at pp. 362–363.

The outstanding difference between the method used by the expert and that adopted in *Seraballs, supra*, that is, between $128,745.54 and $46,752.55 is due in part to the fact that the expert did not deduct one-third from the income as the deceased's own expenses, and also, that he introduced a more or less speculative element of a continued increase in the cost of living. Proof to the effect that the economic loss of $128,745.54 is excessive is the fact that, even using the 5% rate used by the expert, the annual income of that amount is $6,437.28, that is about one and a half times more than the average annual income of the deceased which we computed at $4,691.20. The annual income, under the rate of 6% of the amount of $46,752.55, amounts to $2,805.12 which is only a little lower than that of $3,127.47 annually which we said was the average economic loss through 39 years.

In *Rodríguez, supra* at p. 213, we said that in the determination of lost profit or economic loss "It is not necessary that the evidence show with mathematical accuracy the damages caused on this account; a reasonable basis to permit a wise determination, not the product of speculation and conjecture, is sufficient."

In view of the foregoing, we conclude that the economic loss sustained by the parents as a result of their daughter's death has an actual value of $46,752.55.

We do not think it is fair to reduce even more the actual value of said economic loss through the use, in its determina-

tion, of the life expectancy of the deceased's parents which is necessarily lower.

3–4. It is questioned whether it is correct to grant the moral damages sustained by the deceased before her death as well as the amount for the same.

According to the testimony of Rosalina González Sánchez, mother of Clara Sánchez González, the latter died after a period of 4 or 6 hours had elapsed after the occurrence of the accident where this young woman was injured. A lady picked up the witness and her daughter Nydia in her automobile at the place of the accident and managed to catch up with the ambulance which carried Clara and Rosalina González and Nydia entered the ambulance. The mother testified that in the ambulance she saw "My daughter on a stretcher screaming, in terrible despair, it was awful, I shall never forget it . . .''; that she had "A wound here, about from here to here, all across the forehead, she had this to this side and this here looked white, that bone there, she was all covered with blood and I told her:—'Mami, here I am,' then she threw herself on me and she hung onto me and said to me:—'Mami help me,' I started to pray, we asked God to give us strength . . . . She said to me:—'I can't breathe,' and I told her:— 'scream, scream, my dear; let us pray' then the three of us kept on praying and I said:—'Virgin of the Monserrate, cure her, if you save her we will go on our knees to the top of the steps, until we break our knees"; that Clara said to her "Desperately, she told me:—'help me mami, I can't breathe, help me,' and I said to her:—'baby, scream, scream' ''; that from the time the witness got in the ambulance in Carolina until they reached the hospital it took them "about four hours it was a terrible traffic jam . . ."; that when they reached the Medical Center ". . . I stayed with my girl, she was very prudish, she did not let anyone see her body, on the stretcher she was jumping desperately and I was all the time pulling her skirt down, once the doctor took her on a stretcher

to a room in order to take her blood pressure, and then as she did not let him because she was desperate, it seems that he got angry and I told him 'don't get angry, she is not like that, when she doesn't let anyone do anything to her it is because she is sick, she is very polite and very affectionate and she is the sweetest thing in life'—then the doctor told me:—'no lady, you are wrong, it doesn't bother me, I am not angry'; they took her away for an X ray, and I told him:—'may I go inside?' and he told me:—'of course, come in.' While they were taking her clothes off, I bent myself thus, and I put her face against mine and right there she closed her eyes and immediately they asked me to leave the room. They told me:—'lady, please, we are not dismissing you, but could you go out?' I said:—'of course,' I went to the hall, immediately Nydia came and told me:—'Mami, she is dead, so she died with me.' "

Nydia Sánchez testified that when she got into the ambulance "Clarita was conscious, at no time did she lose consciousness, at the hospital she gave our address and that of a brother"; that she screamed "Mami, mami, help me," that she could not get enough air; that she saw that Clara had a wound "it was rather big, and the hair was towards the back, it was open like some white flesh here . . . she received internal injuries . . ."; that Clarita complained that "she could not scream, and desperate in that ambulance, we told her to scream."

■ No medical testimony was adduced on the nature and extent of the injuries suffered by Clara, on the cause of her death, and on whether or not she may have been conscious or unconscious while she was taken to the hospital and until she died there, and on the degree of the pain and suffering which she could have endured as a result of the injuries suffered in the accident. In *Widow of Delgado* v. *Boston Ins. Co.*, 99 P.R.R. 693 (1971), through our order of May 7, 1971, we left the availability of such damages pending fur-

ther determination. Therefore, likewise, it is proper for us to leave pending the adjudication of the same question raised in this case and decided by the trial judge in favor of the deceased's parents.

■ 5, 6, and 7. The amounts of $50,000, $25,000, $30,000, and $5,000, granted for the mental anguish sustained by the mother, the father, and two sisters, respectively, as a result of the death of Clara Sánchez González are challenged as excessive. The evidence on such damages and what we have previously decided on that particular in other cases having been considered, we conclude that these items should be reduced to the amounts of $25,000, $10,000, $5,000, and $2,000, respectively, taking into consideration not only the particular circumstances of this case, but also the increase in the cost of living which Puerto Rico has undergone since we decided *Ortiz* v. *Great Am. Indemnity Co.*, 83 P.R.R. 296 (1961).

8. Likewise, we think that the granting of $2,500 to each of the minor Néstor Kercadó Sánchez' parents for the moral sufferings caused by the fact that the former was injured in said accident is excessive. The scant evidence of such sufferings and the nature of the minor's injuries, a boy one year and four months old, justify that we reduce these items to the total sum of $1,000.

■ 9. The item for the fees of economist Santiago Meléndez in the costs of the action, item which the trial court approved at the amount of $3,000, is challenged as excessive through certiorari. The testimony of said economist, the credibility which the same deserves, and the study and preparation undoubtedly required in order for the expert to be able to give his testimony having been considered, we conclude that this item should be reduced to $1,000.

10. Defendant-appellant complains that after the judgment was rendered it was not allowed to present evidence as

to the limit of $200,000 of its insurance policy since in its amended answer the defendant-appellant admitted its liability up to the limit of said policy. During the course of the hearing of the case no evidence was adduced on said limit.

In view of the fact that the sum of the damages, expenses, and costs granted amount only to some $115,061, it is not necessary to consider this question since said amount is substantially less than the limit of the policy indicated by defendant-appellant itself.

In view of the foregoing the judgment rendered in this case must be modified in the particulars set forth, and thus modified it must be affirmed.

Mr. Acting Chief Justice Pérez Pimentel concurs in the result. Mr. Justice Rigau and Mr. Justice Martínez Muñoz did not participate herein.